**IN THE UNITED STATES DISTRIC COURT
DISTRICT OF CONNECTICUT**

| | | |
|---|---|---|
| **MARK RUBENSTEIN,** | ) | |
| **JEFFERY NOLAN** | ) | |
|     **ON BEHALF OF THEMSELVES AND** | ) | |
|     **ALL OTHER PERSONS SIMILARLY** | ) | **CIVIL NO.: _____** |
|     **SITUATED,** | ) | |
| | ) | |
|           **Plaintiffs,** | ) | |
| | ) | **JURY TRIAL DEMAND** |
|   **V.** | ) | |
| | ) | |
| | ) | |
| **THE NATIONAL ASSOCIATION OF REALTORS;** | ) | |
| **REALOGY HOLDINGS CORP,;** | ) | |
| **COLDWELL BANKER;** | ) | |
| **SOTHEBY'S INVESTMENT REALTY,;** | ) | |
| **HOMESERVICES OF AMERICA INC.** | ) | |
| | ) | |
|         **DEFENDANTS.** | ) | **MAY 29TH, 2020** |

<u>**CLASS ACTION COMPLAINT**</u>

1

## TABLE OF CONTENTS

I.      Introduction…………………………………………………………...............3-6

II.     Jurisdiction and Venue……………………………………………………6-7

III.    Trade and Commerce……………………………………………...........................7

IV.     Parties……………………………..……………………………..………...7-9

V.      Background on the Real Estate Injury……………………………………9-14

VI.     Anti-Competitive NAR Rules………………………………………..14-15

VII.    NAR Has Required Local Associations to Comply With it Conspiracy…………….15-17

VIII.   Defendant Franchisors Designed and Have Participated in the Conspiracy…………17-19

IX.     Franchisees and Local NAR Associations Have Complied with and Enforced NAR's

Rules in the Areas in Which the Covered MLSs Operate…………………………………19

X.      Effects of Conspiracy……………………………………………….…………19-21

XI.     Market Power…………………………………………..………………22-24

XII.    Continuous Accrual…………………………………………………...24

XIII.   Statute of Limitations…………………………………………………….........25

XIV.    Class Action Allegations………………………………………………25-27

XV.     Claim for Relief…………………………………………………………27-29

XVI.    Requested Relief…………………………………………………...............29-30

## I.     INTRODUCTION

1.   Plaintiff's home buyers, purchased their home on one of twenty multiple listing services(identified below), bring this action against Defendants-the National Association of Realtors and two hundred largest national real estate broker franchisors, Realogy Holding's Corp., HomeServices of America, Inc., Re/Max Holdings, inc., and Keller Realty, Inc. ("Nar" and "Defendant Franchisors" respectively or "Defendants" collectively)- for conspiring to require home buyers to pay the broker representing the buyer of their homes, and to pay at an inflated to pay the broker representing the buyer of their homes, and to pay at an inflated amount by commission and purchase price, in violation of federal antitrust law.

2. Defendants' conspiracy has centered around NAR's adoption and implementation of a rule that requires all brokers to make a blanket, nonnegotiable offer of buyer broker compensation (the "Buyer Broker Commission Rule") when listing a property on a Multiple Listing Service ("MLS").

3. Defendant and their co-conspirators collectively possess market power in local markets for real estate broker services through their control of the local MLS. An MLS is a database of properties listed for sale in a particular geographic region and the marketplace on which the vast majority of homes in the United States are sold. Brokers must list a property for sale on an MLS to effectively marked that property to prospective buyers, and in any event, are required to list all properties on the MLRS if they are members of the MLS. Most MLSs (including all MLSs at issued in this case) are controlled by local NAR associations, and access to such MLSs is conditioned on brokers following all mandatory rules set forth in NARs Handbook on Multiple Listing Policy. The Buyer Broker Commission Rule is a mandatory rule in NAR's Handbook.

3

4. Defendants further required agents to only show properties on the MLSs rather than all properties in a subject area including foreclosure, bank owned and owner sellers inflating the cost of buying a house and inflated the commission paid.

5. The conspiracy had saddled home buyers with an inflated purchase price and related commission that is born by the buyer through commission split with seller agent. Moreover, because most buyer brokers will not show homes to their clients where the seller is offering a lower buyer broker commission, or will show homes with higher commission offers first, sellers are incentivized when making the required blanket, non-negotiable offer to produce the buyer brokers' cooperation by offering a high commission.

6. This method of setting the buyer broker commission is wholly different from the method that would exist absent the Buyer Broker Commission Rule. Absent this rule, buyer brokers would be paid by their clients and would compete to be retained by offering a lower commission. The Buyer Broker Commission Rule ensures that price competition among buyer brokers is restrained because the person retaining the buyer broker, the buyer, does not negotiate or pay his or her broker's commission. In addition, the Defendants also prohibit buyer brokers form making home purchase offers contingent on the reduction of the buyer broker commission. Real estate brokers hand most residential real estate sales in the United States. In a typical transaction, separate brokers will represent the seller and the buyer of a home. Both the buyer broker and seller broker (also known as the listing broker) are paid a percentage of the property's sale price, with approximately half of the amount-and increasingly more than half-paid to the buyer broker.

7. Defendants use their control of the MLS, and Defendant franchisors use their agreements with their local franchises to require brokers in local residential real estate markets to adhere to

4

NAR's rules, including the Buyer Broker Commission Rule.

8. In more competitive foreign markets, home buyers pay their brokers if they choose to use one, and they pay less than half the rate paid to buyer brokers in the United States. In comparable international markets without a rule like the Buyer Broker Commission Rule, such as the United Kingdom, Germany, Israel, Australia, and New Zealand buyer brokers, when they are used, are paid directly by home buyers, rather than by home sellers.

9. Defendants' conspiracy has kept buyer broker commission in the 2.5 to 3.0 percent range for many years despite the diminishing role of buyer brokers. A majority of home buyers no long locate prospective homes with the assistance of a broker, but rather independently through online services. Buyer brokers increasingly have been retained after their client has already found the home the client wishes to buy. Despite their diminishing role, buyer brokers continue to receive 2.5 to 3.0 percent of the sales price due to defendants' conspiracy.

10. This conspiracy has inflated the cost of purchasing a home since the advent of buyer brokers in the 1970s.

11. The conspiracy effect can be seen in disconnect between buyer broker costs and omissions. Buyer broker costs are similar regardless of the price of the home, yet buyer's brokers are paid, for example, four times more when their client buys a million dollar home rather than a $250,000.00 home.

12. The conspiracy has inflated buyer broker commissions, which, in turn, have inflated the total commissions paid by home buyers such as Plaintiff and the other class members. Plaintiff and the other class members have each incurred, on average, thousands of dollars in damages as a result of Defendants' conspiracy. For example, a class member who bought a house for $500,000

5

paid in the range of $12,500 to $15,000 in additional commissions due to the conspiracy. In a competitive market, the seller would pay nothing to the buyer broker, who would be paid instead by the buyer, and the commission paid by the buyer would be set at a level to compensate the buyer broker only.

13. Plaintiffs, on behalf of themselves and the class defined herein , sues for Defendant's violation of the RICO,28 USCA (1961), et seq. as alleged herein, and seeks damage injunctive relief, and the costs of this lawsuit, including reasonable attorneys' fees and punitive damages.

14. Plaintiff brings this lawsuit as a class action on behalf of home buyers who paid a broker commission and bought a house since the broker agent were established in the 1970s in connection with the purchase of residential real estate listed on all MLSs (the "covered MLSs specifically including Connecticut.)

## 1.   JURISDICITON AND VENUE

1. This Court has subject matter jurisdiction under 28 U.S.C. 1961 because the classes contained more than 100 persons, the aggregate amount in controversy exceeds $5,000,000 and at least one member of each class is a citizen of a State different from Defendants.

2. This Court has personal jurisdiction over Defendants, Defendants have: (1) transacted business in the United States, including in the District: (2) transacted with members of classes throughout the United States, including in this District; (3) had substantial contacts with the United States, including this District; and (4) committed substantial acts in furtherance of its unlawful scheme in the United States, including in this District.

3. Venue is proper in this District under 28 U.S.C. 1961. Each Defendant transacted business, was found, had agents and/or resided in this District; a substantial part of the events giving rise to Plaintiffs' claims arose in this District; and a substantial portion of the affected purchases described herein has been carried out in this District.

## 2.   TRADE AND COMMERCE

1. They Buyer Broker Commission Rule and other anticompetitive NAR rules apply and have been implemented by Defendants and co-conspirators, nationwide these rules govern the conduct of local NAR associations, local broker, and local sales agents nationwide. Defendants'' conduct alleged herein has inflated buyer broker commission nationwide including in the areas in which the covered MLSs operate, and has injured home buyers in those areas and nationwide. Defendant NAR, through its members and other co-conspirators, and Defendant Franchisors, through their franchisees and other co-conspirators, are engaged in interstate commerce, and are engaged in activities affecting interstate commerce, in the United States.

## 2.   PARTIES

a. <u>Plaintiff</u>

1. Mark Rubenstein purchased a home in Connecticut utilizing a buyer agent.

2. Jeffery Nolan is a resident of Old Lyme, Connecticut. Mark Rubenstein contracted with a Coldwell Banker buyer agent only. Jeffrey Nolan bought a home located in Connecticut. The home was listed on the Connecticut MLS. In that sales transaction, Mr. Nolan was represented by Sotheby's International Real Estate as both buyer and seller agent. As part of the sale transaction, Mr. Nolan paid a broker commission and an inflated price for the home.

b. <u>Defendants</u>

1. Defendant National Association of Realtors has over 1.2 million individual members and is one of the largest lobbying groups in the country, advocating for the interest of real estate brokers. Its fifty-four state and territorial realtor associations and over 1,200 local realtor associations are members of, and overseen by, NAR. NAR is headquartered in Chicago, Illinois.

2. Defendant Realogy Holdings Corp. ("Realogy") is the nation's largest real estate brokerage company. It is headquartered in Madison, NJ. It is publicly-traded corporation with a market valued in excess of $4 billion. It owns, operates, and franchises many real estate brokerage firms, including Century 21, Coldwell Banker, Sotheby's International Realty, The Corcoran Group, Better Homes and Garden Real Estate, Zip Realty, ERA Real Estate, Citi Habitats, and Climb Real Estate.

3. Defendant HomeServices of America, Inc. ("HomeServices of America") is one of the nation's largest real estate brokerages. It is headquartered in Minneapolis, Minnesota. HomeServices of America is an affiliate of Berkshire Hathaway. It own, operates, and franchises many real estate brokerage firms, including HomeServices Prudential Real Estate, Long & Foster, Real Living, and Edina Realty

4. Defendant Sotheby's International Realty, Inc. is one of the nation's largest real estate brokerages. It is headquartered in Madison, New Jersey. Sotheby's own, operates, and franchises many real estate brokerage firms including a brokerage in Connecticut.

5. Defendant RE/MAX Holdings, Inc. ("RE/MAX") is one of the nation's largest real estate brokerages. It is headquartered in Denver, Colorado. RE/MAX is publicly traded and has a market value of approximately one billion dollars. It franchises local RE/MAX brokers around the county,

8

which have approximately 6,800 offices and more than 100,000 sales associates.

6.    Defendant Keller Williams Realty, Inc. ("Keller Williams") is one of the nation's largest real estate brokerages. It is headquartered in Austin, Texas. It is privately-held company. If franchises local Keller Williams brokers around the country, which have approximately 700 offices and more than 120,000 sales associates.

c. **Co-Conspirators and Agents**

1.    Multiple local realtor associations not named as Defendants participated as co-conspirators in the violations alleged herein and performed acts and made statements in furtherance thereof. Specifically, each of the local realtor associations that own and operate the Covered MLSs (among other realtor associations in other areas of the country) complied with and implemented the Buyer Broker Commission Rule.

2.    The Covered MLSs, among others, have participated as co-conspirators in the violations alleged herein and performed acts and made statements in furtherance thereof, including by adopting the Buyer Broker Commission Rule in their own respective rules and regulations and listing homes at an inflated price.

3.    Multiple franchisees of Defendant Franchisors participated as co-conspirators in the violation alleged herein and performed acts and made statements in furtherance thereof. Specifically, each of those franchisees complied with and implemented the Buyer Broker Commission Rule in the geographic areas in which the Covered MLSs operate. In addition, other brokers in these areas have participated as co-conspirators in the violations alleged herein and performed acts and made statements in furtherance thereof. These other brokers complied with and implemented the Buyer Broker Commission Rule in these geographic areas.

9

### 3.       BACKGORUND ON THE REAL ESTATE INDUSTRY

1.       State licensing laws regulate who can represent sellers and buyers in the real estate market. There are two licensee categories: (1) the real estate broker (also known as a ("brokerage firm"); and (2) the individual real estate licensee or agent. Real estate brokers license individual real estate agents and are legally responsible for the activities of the agents they license.

2.       Licensed brokers are the only entities permitted by state law to be paid to represent buyers or sellers in a real estate transaction. For that reason, all real estate brokerage contracts with sellers and buyers are required to be with brokers, not agents, and all payments to agents must pass through brokers.

3.       According to NAR 92% of sellers sold their homes with the assistance of a real estate broker in 2017, and 87% of buyers purchased their home with the assistance of a real estate broker in 2017.

4.       The standard practice in the residential real estate industry is to compensate brokers and agents with commissions that are calculated as a percentage of a home's sale price. Commissions are paid when the home sells. Buyer agents have a direct financial interest to engage in a conspiracy to manipulate buyers to purchase homes at ever increasing prices over time at prices level greater than true value including causing the 2008 housing bubble.

5.       A seller brokers' compensation is specified in a listing agreement, a contract between the seller and the seller broker that details the terms of the listing. A listing agreement typically states that the seller broker has the exclusive right to market the seller's home. The listing agreement specifies the total commission  that a home seller will pay to the seller broker, often with a portion of that amount earmarked to be paid to the buyer broker in the event the buyer has

10

a broker.

6.　　If the buyer has a broker, the seller or the seller broker pays the buyer broker a commission out of the total commission paid by the seller. In other words, buyer brokers-who assist their clients in negotiating against the seller-receive their compensation from the total commission paid by the seller, not from the buyer they represent. In fact, a standard of conduct in NAR's Code of Ethics permits and encourages buyer brokers to tell their clients that their services are free.

7.　　In the listing agreement, the seller sets the total commission to be paid to the seller broker with the expectation that a portion of the commission will be paid to a buyer broker because buyers are represented by brokers for the overwhelming majority of home sales. If, as would happen in the absence of the Buyer Broker Commission Rule, buyers paid their brokers (a) sellers would agree to pay a commission solely to compensate the seller broker because seller have no incentive to compensate a buyer broker negotiating against their interest, and (b) the seller broker commission would be about half or less of the amount that sellers have paid as a total commission both the buyer broker and the seller broker.

8.　　When a buyer retains broker. The buyer enters into a contract with that broker. The contract typically discloses that the buyer broker will be compensated by receiving a commission from the seller broker.

9.　　An MLS is a database of properties listed for sale in a defined region that is between the seller and the seller broker that details the terms of the listing. A listing agreement typically states that the seller broker has the exclusive right to market the seller's home. The listing agreement specifies the total commission that a home seller will pay to the seller broker, often with

11

a portion of that amount earmarked to be paid to the buyer broker in the event the buyer has a broker.

10.    If the buyer has a broker, the seller or the seller broker pays the buyer broker a commission out of the total commission paid by the seller. In other words, buyer brokers-who assist their clients in negotiating against the seller-receive their compensation from the total commission paid by the seller, not from the buyer they represent. In fact, a standard of conduct in NAR's Code of Ethics permits and encourages buyer brokers to tell their clients that their services are free.

11.    In the listing agreement, the seller sets the total commission to be paid to the seller broker with the expectation that a portion of the commission will be paid to a buyer broker because buyers are represented by brokers for the overwhelming majority of home sales. If, as would happen in the absence in the absence of the Buyer Broker Commission Rule, buyers paid their brokers (a) sellers would agree to pay a commission solely to compensate the seller broker because sellers have no incentive to compensate a buyer broker negotiating against their interests, and (b) the seller broker commission would be about half or less of the amount that sellers have paid as a total commission to compensate both the buyer broker and the seller broker.

12.    When a buyer retains a broker, the buyer enters into a contract with that broker. The contract typically discloses that the buyer broker will be compensated by receiving a commission from the seller broker.

13.    An MLS is a database of properties listed for sale in a defined region that is accessible to real estate brokers and their agents that comply with the rules of MLS. The Covered MLSs are owned and operated by local realtor associations that are members of, and governed by,

NAR, Seller brokers list their client's property on an MLS as required by a NAR Rule, and to ensure that buyer brokers and prospective buyers are aware of the property. If a seller broker does not list a client's property on an MLS, most buyer brokers will not show that property to prospective buyers. MLSs also act as the main source of listings for online websites, such as Zillow, through which many prospective home buyers find homes. A home that is not listed on an MLS is very hard to find for prospective home buyers.

14.     The Buyer Broker Commission Rule obligates a seller broker, on behalf of the seller, to make a blanket, non-negotiable offer of compensation to buyer brokers when listing a home on an MLS owned by local NAR association. If a buyer represented by a broker purchases the home, the buyer broker receives the offered compensation.

15.     The following example illustrates how this process typically works:

• A homeowner enters into a contract with a seller broker, in which the seller agrees to pay the seller broker six percent in total commissions in exchange for marketing and facilitating the sale of the home.

• As required by the Buyer Broker Commission Rule, the seller broker makes a blanket, non-negotiable offer of a three percent commission to the buyer's broker when it lists the home on the local MLS.

• A buyer broker shows the property to a buyer client who buys the home for $500,000 a sum substantially greater than the value of the property.

• The seller broker receives six percent of the sales price ($30,000) from the seller. The seller broker then pays three percent of the sales price.

- The property is appraised by licensed appraisers by comparing the home to other houses in the area, which have been sold or listed at inflated values and pricing on an MLS without inclusion of foreclosed, bank owned and for sale by owner properties.

### 4.  ANTI-COMPETITIVE NAR RULES

1. NAR adopted the Buyer Broker Commission Rule in November 1996 as part of its Handbook on Multiple Listing Policy, and the rule has been continuously in effect ever since.

2. The Handbook states the Buyer Broker Commission Rule as follows: "In filing a property with the multiple listing service of an association of Realtors ®, the participant of the service is making blanket unilateral offers of compensation to the other MLS participants, and shall therefore specify on each listing filed with the service, the compensation being offered to the other MLS participants." The Handbook further states that "Multiple listing services shall not publish listings that do not include an offer of compensation expressed as a percentage of the gross selling price or as a definite dollar amount, nor shall they include general invitations by listing brokers to other participants to discuss term and conditions of possible cooperative relationships."

3. As alleged above, the Buyer Broker Commission Rule shifts a cost to the seller that would be paid by the buyer in a competitive market. Moreover, by requiring the seller to make a blanket, non-negotiable offer, the rule incentivizes sellers to produce the cooperation of buyer brokers by offering a high buyer broker commission or will show other homes first.

4. The Buyer Broker Commission Rule by itself leaves the possibility of buyers seeking to reduce their broker's commission by making that reduction a condition of a home purchase offer. However, NAR specifically adopted a rule to foreclose this possibility. NAR's

Code of Ethics, Standard of Practice 16-16, states: REALTOR, acting as subagents or buyer/tenant representatives or brokers shall not use the terms of an offer to purchase/lease to attempt to modify the listing broker's offer of compensation to subagents of buyer/tenant representatives or brokers nor make the submissions of an executed offer to purchase/lease contingent on the listing broker's agreement to modify the offer of compensation."

5.     In the absence of the Buyer Broker Commission Rule, buyers rather than sellers would pay buyer broker commissions, and brokers would compete with each other by offering lower commissions to prospective buyer clients.

## 5.     NAR HAS REQUIRED LOCAL ASSOCIATIONS TO COMPLY WITH ITS CONSPIRACY

1.     NAR successfully requires its members, including state and local realtor associations, as well as non-member brokers and agents operating in areas with MLSs owned by local realtor associations, to fully comply with the above anti-competitive rules, and with other rules contained in the NAR Handbook and the NAR Code of Ethics.

2.     NAR requires its members that own an MLS to comply with the mandatory provisions in NAR Handbook on Multiple Listing Policy and with NAR's Code of Ethics. The Handbook states that an agreement by an association for the establishment of an MLS must include "roles and responsibilities of each association for enforcement of the Code of Ethics" and the "intent of the multiple listing service(s) to operate in compliance with the multiple listing policies of the National Association."

3.     NAR threatens its individual and associational members with expulsion for failing

to comply with the Code of Ethics. NAR's Code of Ethics states that "[a]ny Member Board which shall neglect or refuse to maintain and enforce the Code of Ethics with respect to do the business activities of its members may, after due notice and opportunity for hearing, be expelled by the Board of Directors from membership in the National Association."

4.      A local realtor association owns each of the Covered MLSs, and those realtor association are required by NAR to ensure that is MLS and the MLSs, and those adhere to the mandatory provisions in NAR's Handbook on Multiple Listing Policy. Because access to the Covered MLSs, and other MLSs, is a commercial necessity for all brokers and agents, all brokers and agents must comply with the mandatory provisions in NAR's Handbook. Without access to a local a MLS, including the Covered MLSs, a broker or agent would be unable to list properties for sale in the centralized database or receive offers of compensation for finding a buyer for a listed property.

5.      NAR has established and disseminated model rules for local realtor associations, and for the MLSs that these local associations own and operate, and those model rules require adherence to both NAR's Code of Ethics and the Handbook on Multiple Listing Policy.

6.      One of the many benefits NAR provided to its realtors associations and the MLSs owned by those associations is professional liability insurance. To be eligible for this insurance, realtor associations and their MLSs must comply with the mandatory provisions in the Handbook on Multiple Listing Policy. NAR threatens to withhold these valuable insurance benefits from realtor associations and MLSs that fail to comply with these mandatory provisions. NAR's Handbook states that "[t]hose associations or multiple listing services found by the National Association to be operating under bylaws or rules and regulations not approved by National

16

Association are not entitled to errors and omissions insurance coverage and their charters are subject to revocation."

7.     NAR reviews the governing documents of its local realtor associations to ensure compliance with its rules. NAR requires its local realtor associations to demonstrate their compliance with these rules by periodically sending their governing documents to NAR for review.

## 6.     DEFENDANT FRANCHISORS DESIGNED AND HAVE PARTICIPATED IN THE CONSPIRACY

1.     Defendant Franchisors orchestrated and have participated in the conspiracy alleged herein in three ways: (1) they have required their franchisees (and the agents employed by those franchisees) to comply with NAR rules including the Buyer Broker Commission Rule; (2) their executives have supervised NAR's operations including NAR's adoption, maintenance, and enforcement of the Buyer Broker Commission Rule; and (3) their franchisees have influenced local realtor associations that adopted and enforced NAR's rules, including the Buyer Broker Commission Rule.

2.     First, Defendant Franchisors implemented the conspiracy by requiring that their franchisees in the geographic areas in which the Covered MLSs operate, and elsewhere, and the agents employed by those franchisees, comply with NAR's rules, including the Buyer Broker Commission Rule.  Franchise agreements between Defendant Franchisors and their franchisees located in the areas in which the Covered MLSs operate, and throughout the United States, require those franchisees and their agents to (1) comply with NAR's Code of Ethics; (2) join and comply with the rules of the local realtor association; and (3) participate in and comply with the rules of

the local MLS, which include the mandatory provisions of NAR's Handbook on Multiple Listing Policy.

3.     For example, the franchise agreement between Defendant RE/MAX and a RE/MAX franchisee in Las Vegas states: "You agree that you and each of your Sales Associates will join and remain a member in good standing and comply with the by-laws and rules and regulations of a local Board of REALTORS© (or comparable organization) and, where available, you will become and remain a participant in a board owned multiple listing service. You also agree that you and your Sales Associates will abide by the Code of Ethics of the National Association of REALTORS©."

4.     Second, executives from Defendant Franchisors have actively participated in the management and operation of NAR. NAR's board of directors promulgated the rules in NAR's Handbook and its Code of Ethics, including Buyer Broker Commission Rule, and many of those rules were developed and drafted by NAR's Professional Standards Committee. Senior executives of Defendant Franchisors have served on NAR's governing board of directors. For example, both Ronald J. Peltier, the Executive Chairman of HomeServices of America, and Nancy Nagy CEO of Berkshire Hathaway HomeServices KoenigRubloof Realty Group, currently serve as directors of NA, and Bruce Aydt, Senior Vice President and General Counsel of Berkshire Hathaway HomeServices Alliance Real Estate, is the former Chair of NAR's Professional Standards Committee.

5.     Executive of franchisees of Defendant Franchisors also dominated the 2018 eight-person Leadership Team that managed NAR's day-today operations. For example, the immediate past President of NAR, Elizabeth Mendenhall, is the Boone CEO of Remax Boone Realty in

18

Missouri. The President of NAR is John Smaby, a sales agent at Edina Realty, which is a home service of America company. NAR's Vice President of Association Affairs, Colleen Badagliacco, is an agent for Legacy Real Estate and Associates, which is the a franchisee of a Realogy firm. The 2019 leadership team includes John Smaby and Elizabeth Mendenhall, as well as Charlie Oppler, First Vice President and COO of a Sotheby's International Realty franchisee and Tracy Kasper, Vice President of Advocacy and broker/owner of Berkshire Hathaway franchisee.

6.      Third, executive of franchisees of Defendant Franchisors have participated in governing of the local realtor associations that own and operate the Covered MLSs (and participate in the governance of other local realtor association, and they implemented the conspiracy through the associations. Those executives and local realtor associations required compliance with the NAR rules, including the Buyer Broker Commission Rule, and adopted standard form contracts implementing the NAR rules.

## 7.      FRANCHISEES AND LOCAL NAR ASSOCIATONS HAVE COMPLIED WTH AND ENFORCED NAR'S RULES IN THE AREAS IN WHICH THE COVERED MLSs OPERATE

1.      In each of the areas in which the Covered MLSs operate (and elsewhere), franchisees of Defendant Franchisors collaborated with local realtor association to implement, comply with, and enforce NAR's rules, including the Buyer Broker Commission Rule, in furtherance of the conspiracy alleged herein.

## 8.      EFFECTS OF THE CONSPIRACY

1.      Defendants' conspiracy has had the following effects, among others, in each area

in which a Covered MLS operates, and nationwide:

- Home sellers have been forced to pay commissions to buyer brokers-their adversaries in negotiations to sell their homes-thereby substantially inflating the cost of selling their homes.

- Home sellers have been compelled to set a high buyer broker commission to induce buyer brokers to show their homes to the buyer brokers' clients.

- Home buyers have paid inflated buyer broker commissions and inflated total commissions.

- The retention of a buyer broker has been severed from the setting of the broker's commission; the home buyer retains the buyer broker, while the home seller sets the buyer broker's compensation.

- Price competition among brokers to be retained by home buyers has been restrained.

- Competition among home buyers has been restrained by their inability to compete for the purchase of a home by lowering the buyer broker commission.

- Defendant Franchisors and their franchisees have increased their profits substantially by receiving inflated buyer broker commissions and inflated total commissions by selling homes above the value due to the buyer agent participating in the sale price.

2.     There is substantial economic evidence that Defendants' conspiracy has resulted in buyer broker commissions and total commissions paid by home sellers that are inflated well above a competitive level nationwide, including in the areas in which the Covered MLSs operate.

3.      Total Broker Commissions (i.e., the aggregate commission paid to the seller broker and buyer broker) in the areas in which the Covered MLSs operate average between five and six percent. This figure is substantially higher than in countries with competitive markets for residential real estate brokerage services. In a 2020 study titled "International Residential Real Estate Brokerage Fees and Implications for the US," economists Natalya Delcoure and Norm Miller compared real estate commissions around the world with those in the United States. They concluded: "Globally, we see much lower residential commission rates in most of the other highly industrialized nations, including the United Kingdom, Hon Kong, Ireland, Singapore, Australia, and New Zealand. … In the UK, the [total] commission rates average less than 2%... In New Zealand and South Africa [total] commission rates average 3.14%. in Singapore, the [total] commission rates also tend to run around 3%." They also found variation within countries; in the United Kingdom, for example, Delcoure and Miller found that "1%-2% is typical; in very competitive areas 0.5-0.75 in low priced areas [for homes] as high as 3.5%." Ultimately, the economist concluded that, "based on global data, the [total] US residential brokerage fees should run closer to 3.0%.

4.      For years, buyer broker commissions have remand steady at two-and-a-half to three percent in the areas in which the Covered MLSs operate despite both an increase in home prices (increasing the dollar amount of the commission) and the diminishing role of buyer brokers described above.

5.      The median national housing price was $165,30 in 2000 and $325,200 in Q3 2018. Commission dollars per home thus have roughly doubled over this time period, while the total rate of inflation was below 50% during that same period.

### 9.      MARKET POWER

1.      The relevant service market for the claims asserted herein is the bundle of services provided to home buyers and sellers by residential real estate brokers with MLS access. Defendants' control of the Covered MLSs gives Defendants the ability to impose the Buyer Broker Commission Rule and other anticompetitive NAR rules on class members and other market participants. Access to the Covered MLSs is critical for brokers to compete and to assist home buyers and sellers in the areas in which those MLSs operate.

2.      The relevant geographic markets for the claims asserted herein are not broader that the geographic areas in which the twenty Covered MLSs operate. Nearly all homes sold in these geographic areas were listed on the MLS by brokers that are subject to the MLS and NAR rules and standards. The residential real estate business is local in nature. Most sellers prefer to work with a broker who is familiar with local market conditions and who maintains an office or affiliated sales associates within a reasonable distance of the seller's property. Likewise, most buyers seek to purchase property in a particular city, community, or neighborhood, and typically prefer to work with a broker who has knowledge of the area in which they have an interest.

3.      Defendant franchisors, through their co-conspirator franchisees and other conspiring brokers in the areas in which the Covered MLSs operate, collectively provide the vast majority of the residential real estate services in these areas.

4.      Defendants and their co-conspirators collectively have market power in each relevant market through their control of the local MLS and their dominated share of the local market.

5.      Any buyer brokers in the areas in which Covered MLSs operate who wished to

compete outside of Defendant's conspiracy would face insurmountable barriers. Defendant's control of the Covered MLSs through their co-conspirators (i.e., through their local franchisees, other local brokers, and the local realtor associations) means that non-conspiring brokers would need to establish an alternative listing service to compete with the conspiring brokers, or alternatively, attempt to compete without access to a listing service. A broker who represented a seller without using a listing service would lose access to the large majority of potential buyers, and a broker who represented a buyer without using a listing service would lose access to the large majority of sellers. Brokers cannot compete effectively without access to a listing service.

6.      For an alternative listing service to compete effectively with one of the Covered MLSs, the alternative would need to have listings as comprehensive (or at least nearly so) as the Covered MLS. Brokers and their agents who currently profit from inflated buyer broker commissions and total commissions have minimal incentive to participate on an alternative listing service that would generate lower buyer broker commissions and lower total commissions Further, many buyers would be very reluctant to retain a buyer broker operating on an alternative listing service that required them to pay the buyer broker commission, when other buyer brokers operating on the Covered MLSs are entirely compensated by home sellers. Accordingly, seller brokers on an alternative listing service would struggle to attract buyer brokers and their buyer clients. Moreover, many home sellers would not retain brokers using a new, unfamiliar alternative listing services that had not rack record of success and had failed to attract sufficient buyers and buyer brokers. Accordingly, a listing service attempting to compete with any of the Covered MLSs would likely fail to attract enough property listings to operate profitably and be a competitive constraint of the incumbent MLS. The absence of listing serves that compete with the Covered MLSs (or

other MLSs) reflects the very substantial barriers to entry.

7.      Moreover, NAR advised MLSs to enter into non-compete agreements with third-party websites, such as Zillow, so that those websites do not become competitive rivals to MLSs. NAR's checklist of "critical components" states that the consumer-facing website "must agree they will not compete with the brokerage firms or MLS by either becoming a licensed brokerage firm or by providing offers of cooperation and compensation." The non-compete agreement requires the consumer-facing website to agree not to "use the data in a manner that is similar to a Multiple Listing Service." Thus, NAR in furtherance of the conspiracy, has advised MLSs to take affirmative steps to prevent third-party websites form becoming competitors.

## 10.      CONTINOUS ACCRUAL

1.      During the years preceding the filing of this complaint, Defendants through their co-conspirator brokers in the areas in which the Covered MLSs operate, repeatedly charged and received buyer broker commissions and total commission and housing prices that were inflated as a result of the conspiracy. These inflated commissions during the preceding years were paid by Plaintiff and the other class members in connection with the sale of residential real estate listed on one of the Covered MLSs. Each payment of these inflated commissions by Plaintiffs and the other class members during the last year injured them and gave rise to a new cause of action for that injury.

2.      During the years, Defendants and their co-conspirators have maintained, implemented, and enforced the Buyer Broker Commission Rule and other anticompetitive NAR rules nationwide, including in the areas in which the Covered MLSs operate.

24

## 11.    STATUTE OF LIMITATIONS

The Federal Courts have ruled that a Civil Rico claim has a four year statute of limitations. However, the running of the statute beings when the plaintiff discovers the existence of a cause of action.

*Connecticut General Statutes* section 52-595 stated as follows:

**Fraudulent concealment of cause of action.** If any person liable to an action by another, fraudulently conceals from him the existence of cause of such action, such cause of action shall be deemed to accrue against such person so liable, therefore at the time when the person entitled to sue thereon first discovers its existence.

The plaintiff asserts the defendants fraudulently concealed the existence of a cause of action based upon documents telling agents to inform buyers that the seller pays the commission for the buyer agent failed to state that buyer agents commission is based upon the purchase price thereby creating a disincentive to find a or negotiate lower priced homes and to market only MLS listed homes to the exclusion of bank owned, foreclosed and for sale by owner properties.

## 12.    CLASS ACTION ALLEGATIONS

1.      Pursuant to Rules 23(2), (b)(2) and (b)(3) of the Federal Rules of Civil Procedure, Plaintiff's brings the action on behalf of themselves and the following class: all persons who paid a buyer broker commission through their purchase price in connection with the purchase of residential real estate on using on an MLSs.

2.      Excluded from the class are Defendants and their officers and directors; and the judicial officer(s) presiding over this action and the members of his/her/their immediate family and judicial

25

staff

3.      The class is readily ascertainable because records of the relevant transactions should exit.

4.      Due to the nature of the trade and commerce involved, Plaintiff believes that the Class has many thousands of members, the exact number and their identities being known to Defendants and their co-conspirators.

5.      Plaintiff's claims are typical of the claims of the members of the Class. Plaintiff will fairly and adequately protect the interests of the members of the Class. Plaintiff's interests are aligned with, and not antagonistic to, those of the other members of the Class.

6.      There are questions of law and fact common to the members of the Class, including, but not limited to, the following:

A.      Whether Defendants conspired as alleged herein;

B.      Whether the conspiracy was implemented in the areas in which the Covered MLS operate;

C.      Whether the conspiracy harmed competition as alleged herein;

D.      Whether the competitive harm from the conspiracy substantially outweighs any competitive benefits;

E.      Whether the buyer broker commissions and total commissions were inflated as a result of the conspiracy;

F.      The appropriate class-wide measures of damages; and

G.      Whether the purchase price of houses were inflated.

7.      Plaintiff has retained counsel competent and experienced in the prosecution of antitrust class action litigation to represent himself and the Class.

8.      Question of law or fact that are common to the members of the Class predominate over any

26

question affecting only individual members of Class.

9.      A class action is superior to other available methods for the fair and efficient adjudication of this controversy. The prosecution of separate actions by individual members of the Class would impose heavy burdens of the court and Defendants and would create a risk of inconsistent or varying adjudications of the questions of law and fact common to Class. A class action, on the other hand, would achieve substantial economics of time, effort and expense, and would assure uniformity of decision as to persons similarly situated without sacrificing procedural fairness or brining about other undesirable results. Absent a class action, it would not be feasible for the vast majority of the members of the Class to seek redress for violations of law alleged herein.

### 13.      CLAIM FOR RELIEF

**Claim 1: Violation of Section 1 of RICO 28 USCA, 1962 Giving the Plaintiff a Civil Right of Action, Pursuant to 28 USCA 1964(c)**

1.      Plaintiff repeats and incorporates by reference each of the foregoing allegations of this complaint.

2.      Beginning years before this complaint defendants engaged in a continuing contract, combination or conspiracy in a pattern of racketeering activity by wire and mail fraud. The misrepresentation as to the payment of brokerage commissions by seller and the value of houses sold is an actual and proximate cause of harm to buyers. The contract, combination, or conspiracy alleged herein has consisted of a continuing agreement among Defendants and their co-conspirators to requires home sellers to pay the buyer broker to pay an inflated amount.

3.      The pattern of racketeering activity as alleged included defendants mailing and wiring contracts, loan application, and other documents to effectuate the purchase of homes and

27

documents advertising homes for sale in support of the conspiracy to inflate the values.

4.      The plaintiff's as buyers were and are the targets of the racketeers.

5.      The defendant intended to repeat the conduct into the future as part of our entities regular way of doing business.

6.      In furtherance of the contract, combination, or conspiracy, Defendant and their co-conspirators have committed one or more of the following overt acts:

A.      Participated in the establishment, maintenance, and implementation of the Buyer Broker Commission Rule and other anticompetitive NAR rules;

B.      Participated in the establishment, maintenance, and implementation of rules by local NAR associations and MLSs that implemented the Buyer Broker Commission Rule and other anticompetitive NAR rules in the areas in which the Covered MLSs operate.

C.      Included provisions in franchise agreements with franchisees of Defendant Franchisor that required the franchisees to implement the Buyer Broker Commission Rule and other anticompetitive NAR rules in the areas in which the Covered MLSs operate.

7.      In the areas in which the Covered MLSs operate, and elsewhere, Defendants' conspiracy has required sellers to pay buyer brokers, to pay an inflated buyer broker commission and an inflated total commission and has retained price competition among buyer brokers and inflated the price of house beyond the actual value since the implementation of the buyer broker conspiracy in the 1970s.

8.      Defendants' conspiracy has caused buyer broker commissions and total commissions in the areas in which the Covered MLSs operate (and elsewhere) to be inflated. Plaintiff and the other members of the Class paid these inflated commission during (and before) the last four year in

28

connection with the sale of residential real estate listed on one of the Covered MLSs. Absent Defendants' conspiracy, Plaintiff and the other class members would have paid substantially lower commissions because the broker representing the buyer of their homes would have been paid by the buyer.

9.      As a direct and proximate result of Defendant's past and continuing RICO Act. Plaintiff and the other class members have been injured in their business and property and suffered damages in an amount to be proven at trial.


## 14.     REQUESTED RELEIF

1.      Plaintiff requests relief as follows:

A.      That the Court determine the actions may be maintained as a class action under Rules 23(a), (b)(2) and (b)(3) of the Federal Rules of Civil Procedure, and direct that notice of this action, as provided by Rule 23(c)(2) of the Federal Rules of Civil Procedure, be given to members of the Class;

B.      That the Court enter an order declaring that Defendants' actions, as set forth in this Complaint, violate the law, 28USCA (1961), et set;

C.      That the Court award Plaintiff and the other members of the class treble damages and/or restitution in an amount to be determined at trials;

D.      That the Court award Plaintiff pre-and post-judgment interest;

E.      That the Court award Plaintiff his costs of suit, including reasonable attorneys' fees and expenses;

F.      That the Court award Plaintiff and the Class a permanent injunction; and

G.     That the Court awarded such other relief as the Court may deem just and proper.


## JURY TRIAL DEMAND

Plaintiff demands a jury trial of all issues so triable.


                              Respectfully submitted
                              PLAINTIFF,

                              By: _/s/Jeremiah N. Ollennu(#28038)_____
                              Jeremiah Nii-Amaa Ollennu, Esq. (CT28038)
                              Orthopaedic Injury Lawyers, LLC
                              10 Grand Street, 2nd Floor
                              Hartford, CT 06106
                              Tel: (860)200-8839
                              Fax: (860)218-2158
                              Email: jeremiah.ollennu@ctlawprime.com