UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

MARK RUBENSTEIN *et al.*,
    *Plaintiffs*,

v.

NATIONAL ASSOCIATION OF
REALTORS *et al.*,
    *Defendants*.

No. 3:20-cv-00742 (JAM)

**ORDER GRANTING DEFENDANTS' MOTIONS TO DISMISS**

    Is the nation's housing market permeated by fraud? Yes, say the plaintiff homebuyers in this putative class action. They have filed a RICO conspiracy claim against the National Association of Realtors and several major real estate brokerage companies. They claim that the defendants have perpetrated an enormous fraud by means of rules and practices governing payments to buyers' brokers in housing real estate transactions.

    But the problem is that their conclusory allegations of "fraud" are not supported by any plausible allegations of misrepresentations or other deception. They have alleged at most that buyers' brokers are paid too much for doing too little and that the result is that home buyers end up paying more for their homes than they should. If true, this is unfortunate but not a fraud. I will dismiss the complaint.

### BACKGROUND

    The plaintiffs are two home buyers who have filed this class action lawsuit against the defendant National Association of Realtors and against five more defendants who are alleged to be among the nation's largest real estate brokerages—Realogy Holdings Corp., HomeServices of America, Inc., Sotheby's International Realty, Inc., RE/MAX Holding, Inc., and Keller Williams

1

Realty, Inc.[1] They claim that the defendants have entered into a conspiracy that is "centered" on the adoption and implementation of a rule by the National Association of Realtors known as the "Buyer Broker Commission Rule."[2]

In essence, the Buyer Broker Commission Rule requires that, if a buyer for a home has their own broker, that broker's commission is paid as a fixed percentage of the sales price and is paid from the total commission that is paid by the seller to the seller's broker.[3] The commission for the buyer's broker is calculated and paid in this manner rather than being subject to individual negotiation between the buyer and their broker and rather than being paid directly by the buyer to their own broker.[4]

According to the complaint, if not for the Buyer Broker Commission Rule, buyer brokers "would be paid by their clients and would compete to be retained by offering a lower commission."[5] But as a result of the Buyer Broker Commission Rule, "price competition among buyer brokers is restrained because the person retaining the buyer broker, the buyer, does not negotiate or pay his or her broker's commission."[6] "In more competitive foreign markets, home buyers pay their brokers if they choose to use one, and they pay less than half the rate paid to buyer brokers in the United States."[7]

According to the complaint, buyer brokers in the United States have long been and continue to be paid 2.5% to 3% of the home sales price despite the fact that a majority of home

---

[1] Doc. #38 at 8-9 (¶¶ 1-6).
[2] *Id.* at 3 (¶ 2).
[3] *Id.* at 4 (¶ 6), 10-11 (¶¶ 5-6); *see also id.* at 13 (¶ 14) (alleging that "[t]he Buyer Broker Commission Rule obligates a seller broker, on behalf of the seller, to make a blanket, non-negotiable offer of compensation to buyer brokers when listing a home on an MLS [Multiple Listing Service] owned by [a] local NAR [National Association of Realtors] association" and that "[i]f a buyer represented by a broker purchases the home, the buyer broker receives the offered compensation").
[4] *Id.* at 4 (¶ 6).
[5] *Ibid.*
[6] *Ibid.*
[7] *Id.* at 5 (¶ 8).

buyers now use online services to find homes for sale and do not use the assistance of a broker to find homes for sale.[8] "Defendants' conspiracy has kept buyer broker commission[s] in the 2.5 to 3.0 percent range for many years despite the diminishing role of buyer brokers."[9]

The complaint alleges that "[t]his conspiracy has inflated the cost of purchasing a home since the advent of buyer brokers in the 1970s."[10] But "[i]n a competitive market, the seller would pay nothing to the buyer broker, who would be paid instead by the buyer, and the commission paid by the buyer would be set at a level to compensate the buyer broker only."[11]

Are prospective home buyers kept in the dark about how a buyer's broker will be paid? No, they are not. The complaint alleges that "[w]hen a buyer retains a broker, the buyer enters into a contract with that broker."[12] It further alleges that "[t]he contract typically discloses that the buyer broker will be compensated by receiving a commission from the seller broker."[13]

According to the complaint, the Buyer Broker Commission Rule has been issued by the defendant National Association of Realtors and implemented by the remaining defendants as well as numerous of their co-conspirator franchises and local real estate associations that own and operate multiple listing services ("MLSs").[14] The National Association of Realtors requires its members and others using MLSs to comply with the Buyer Broker Commission Rule.[15] The remaining defendant brokerages similarly require their franchisees and agents employed by those franchisees to comply with the Buyer Broker Commission Rule.[16]

The complaint states a single claim for relief under the Racketeering Influenced and

---

[8] *Id.* at 5 (¶ 9).
[9] *Ibid.*
[10] *Id.* at 5 (¶ 10).
[11] *Id.* at 6 (¶ 12).
[12] *Id.* at 12 (¶ 12).
[13] *Id.* at 12-13 (¶ 12).
[14] *Id.* at 7 (¶ 1), 9-10 (¶¶ 1-3), 15 (¶ 1).
[15] *Id.* at 15 (¶ 1).
[16] *Id.* at 17 (¶ 1).

Corrupt Organizations Act ("RICO"), 18 U.S.C. § 1962(c)-(d). It alleges that the "defendants engaged in a continuing contract, combination or conspiracy in a pattern of racketeering activity by wire and mail fraud."[17] "The misrepresentation as to the payment of brokerage commissions by seller[s] and the value of houses sold is an actual and proximate cause of harm to buyers."[18] "The contract, combination, or conspiracy alleged herein has consisted of a continuing agreement among Defendants and their co-conspirators to require[] home sellers to pay the buyer broker [] an inflated amount."[19]

The defendants have moved to dismiss. Although the defendants raise varying grounds for dismissal, I need only address the issue of whether the complaint plausibly alleges fraud to support its claim of a RICO conspiracy.

## DISCUSSION

When considering a motion to dismiss under Rule 12(b)(6), a court must first accept as true all factual matters alleged in the complaint and draw all reasonable inferences for the plaintiff. *See Hernandez v. United States*, 939 F.3d 191, 198 (2d Cir. 2019). Apart from any conclusory recitations, a complaint must include enough facts to state plausible grounds for relief. *See Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). Although this plausibility requirement is not a probability requirement, it does demand "more than a sheer possibility that a defendant has acted unlawfully." *Ibid.*[20]

A RICO cause of action requires a plaintiff to show that the defendant by means of the commission of two or more acts that constitute a pattern of racketeering activity has participated

---

[17] *Id.* at 28 (¶ 2).
[18] *Ibid.*
[19] *Ibid.*
[20] Unless otherwise indicated, this ruling omits internal quotation marks, alterations, citations, and footnotes in text quoted from court decisions.

4

in an enterprise affecting interstate or foreign commerce. *See Williams v. Affinion Grp., LLC*, 889 F.3d 116, 123-24 (2d Cir. 2018) (citing 18 U.S.C. § 1962(c)). For a claim of a RICO conspiracy, a plaintiff must allege that two or more defendants agreed to engage in such a pattern of racketeering activity. *See id.* at 124 (citing 18 U.S.C. § 1962(d)).

The RICO statute lists the types of unlawful predicate acts that may constitute racketeering activity. *See ibid.* (citing 18 U.S.C. § 1961(1)). Among those predicates are criminal acts of federal mail or wire fraud. *See ibid.* (citing 18 U.S.C. §§ 1341, 1343).

A claim of mail or wire fraud requires a plaintiff to prove in part the existence of an artifice or scheme to defraud by means of deception or misrepresentation. *See ibid.* Although "the mail or wire communications themselves need not contain a false statement, … a plaintiff still needs to allege a material misrepresentation as part of the defendants' scheme to fraud to state a violation of section 1341 or 1343." *Id.* at 125.

Moreover, it is not enough to allege a fraud or misrepresentation in conclusory terms. The elements of mail and wire fraud must be pled with particularity—that is, the "[t]he complaint must detail the specific statements that are false or fraudulent, identify the speaker, state when and where the statements were made, and explain why the statements were fraudulent." *Id.* at 124 (citing Fed. R. Civ. P. 9(b)).

In light of these background principles, it is readily evident that the complaint here must be dismissed, because it fails to allege any facts to plausibly suggest fraud or misrepresentation, much less to allege the required facts with particularity. Although the complaint assails the Buyer Broker Commission Rule on the ground that it leads to higher home prices and is anti-competitive, the complaint does not allege any facts to suggest that the plaintiffs—or anyone else—have been deceived by any scheme or misrepresentation concerning the role of and

payment arrangements with buyers' brokers. To the contrary, the complaint includes allegations strongly suggesting that the plaintiffs and other home buyers were *not* misled or deceived: "[w]hen a buyer retains a broker, the buyer enters into a contract with that broker," and "[t]he contract *typically discloses that the buyer broker will be compensated by receiving a commission from the seller broker*."[21]

The closest that the complaint comes to alleging actual fraud or misrepresentation is a stray allegation that "a standard of conduct in NAR's Code of Ethics permits and encourages buyer brokers to tell their clients that their services are free."[22] But it does not allege that the two plaintiffs themselves were so misled by their brokers. And even if this allegation were liberally interpreted to mean that buyer brokers actually *tell* their clients that their services are free (as distinct from the complaint's allegation that they are merely *permitted and encouraged* to do so), it could not be reconciled with the complaint's above-described allegation that buyers enter into contracts with buyer brokers that "typically disclose[] that the buyer broker will be compensated by receiving a commission from the seller broker."[23]

The complaint later alleges in conclusory terms that "[t]he misrepresentation as to the payment of brokerage commissions by seller[s] and the value of houses sold is an actual and proximate cause of harm to buyers."[24] But apart from this single conclusory use of the term "misrepresentation," the complaint does not describe what misrepresentations were made.

Rather than detailing any fraud or misrepresentations, the vast majority of the complaint is devoted to antitrust-like allegations suggesting that the Buyer Broker Commission Rule amounts to an anti-competitive abuse of market power. But "antitrust violations are not on the

---

[21] Doc. #38 at 12-13 (¶ 12) (emphasis added).
[22] *Id.* at 12 (¶ 10).
[23] *Id.* at 12-13 (¶ 12).
[24] *Id.* at 28 (¶ 2).

6

list of predicate acts in 18 U.S.C. § 1961(1), and thus, cannot be the basis of a RICO claim." *St. Clair v. Citizens Fin. Grp.*, 340 F. App'x 62, 66 (3d Cir. 2009).[25]

Nor do the allegations of the plaintiffs' RICO "case statement" salvage the deficiencies of the complaint.[26] The case statement alleges without elaboration that "Buyer Agents further falsely and fraudulently state that their commissions are paid by the Seller without stating that their commission is paid with the Buyer's money and is based upon the purchase price of the property."[27] But neither the case statement nor the complaint allege that the two plaintiffs in this action were so misled by their own buyer brokers.

Moreover, this allegation concedes that buyers are in fact told that their broker will be paid by the seller. To the extent it complains that buyers are not told about the seller's source of funds for the payment (from the seller's receipt of money from the buyer for the property sale), this alleged omission is plainly not misleading or material. To the contrary, a reasonable buyer—once told that his own agent's commission will be paid by the seller—would naturally assume that the payment of the commission would come from the seller's receipt of the buyer's funds in connection with the underlying sale transaction. Indeed, the very term "commission" connotes the payment of money incidental to the successful completion of an underlying transaction and that may be calculated as a percentage of the underlying sales price.[28]

---

[25] It appears that the complaint is patterned on federal antitrust complaints filed in other federal courts. *See, e.g.*, *Moehrl v. Nat'l Ass'n of Realtors*, 492 F. Supp. 3d 768, 774-76 (N.D. Ill. 2020); *Sitzer v. Nat'l Ass'n of Realtors*, 420 F. Supp. 3d 903, 910 (W.D. Mo. 2019).

[26] The District of Connecticut has a standing order that requires the filing of a "case statement" to supplement the allegations of a complaint that alleges a RICO violation. The case statement should be considered when a court evaluates a motion to dismiss for failure to state a claim. *See Commercial Cleaning Servs., L.L.C. v. Colin Serv. Sys., Inc.*, 271 F.3d 374, 378 (2d Cir. 2001).

[27] Doc. # 41 at 2 (¶ 1.A).

[28] *Commission*, Merriam-Webster.com, https://www merriam-webster.com/dictionary/commission [https://perma.cc/363H-P59G] (last accessed July 26, 2021) (defining the term "commission" in part to include "a fee paid to an agent or employee for transacting a piece of business or performing a service *especially*: a percentage of the money received from a total paid to the agent responsible for the business").

The RICO case statement includes additional scattered references to the terms "fraud" and "fraudulent." Yet it lacks any intelligible details about the nature of such fraud or any misrepresentations made.

When a court grants a motion to dismiss for failure to state a claim under Fed. R. Civ. P. 12(b)(6), it ordinarily grants the motion without prejudice to the filing of an amended complaint. But the plaintiffs have already once filed an amended complaint, and they have also belatedly complied with their obligation to file a RICO case statement only after a motion to require them to do so was filed.[29] They have had ample opportunity to adequately allege acts of mail or wire fraud to support a RICO claim. They have not done so.

It is apparent as well that any amended complaint would be futile. The plaintiffs have doomed any RICO claim of fraud by means of alleging and acknowledging that home buyers enter into contracts with buyer brokers that typically disclose that the buyer broker will be compensated by receiving a commission from the seller broker.[30]

In their response to the motions to dismiss, the plaintiffs fail to identify any additional allegations they would state to support a claim for mail or wire fraud. Instead, they wrongly insist that they have already "met the heightened requirement to plead fraud with particularity" and that "specific citations to each instance of fraudulent conduct within the Amended Complaint should not be necessary."[31]

When I asked counsel for the plaintiffs at oral argument about the lack of allegations to

---

[29] Doc. #16; D. Conn. Standing Order in Civil RICO Cases (requiring a civil RICO plaintiff to file a RICO Case Statement within 20 days of filing a RICO complaint and further stating that "[i]f the RICO claim is based on the predicate offenses of wire fraud, mail fraud, or fraud in the sale of securities, [then] the 'circumstances constituting fraud or mistake shall be stated with particularity.' Fed. R. Civ. P. 9(b)" and that "[t]he time, place and contents of the alleged misrepresentations, and the identity of persons to whom and by whom the alleged misrepresentations were made shall be identified").
[30] Doc. #38 at 12-13 (¶ 12).
[31] Doc. #89 at 35.

show fraud, counsel newly claimed that it was fraudulent for the plaintiffs not to have been advised that the buyer's broker's commission "is set by the NAR [National Association of Realtors] and it's being implemented under possible sanctions by the NAR."[32] But the fact that the plaintiffs may not have known more about the role of the National Association of Realtors does nothing to suggest that the representations actually made to the plaintiffs or other putative class members were misleading or fraudulent. Nor was counsel able to state in response to my question at oral argument with any specificity what he would additionally allege in an amended complaint to plausibly establish acts of mail or wire fraud to support a RICO conspiracy claim.[33]

"Courts have described civil RICO as 'an unusually potent weapon—the litigation equivalent of a thermonuclear device.'" *Flexborrow LLC v. TD Auto Fin. LLC*, 255 F. Supp. 3d 406, 414 (E.D.N.Y. 2017). But here any such device has been defused with a single question: where is the fraud? None has been or can be plausibly alleged. Accordingly, I will grant the defendants' motions to dismiss with prejudice.

## CONCLUSION

For the reasons set forth above, the Court GRANTS with prejudice the defendants' motions to dismiss (Docs. #59, #64, #66, #82, and #83). The Clerk of Court shall close this case.

It is so ordered.

Dated at New Haven this 26th day of July 2021.

/s/ *Jeffrey Alker Meyer*
Jeffrey Alker Meyer
United States District Judge

---

[32] Doc. #104 at 35; *see also id.* at 45 (THE COURT: So to be clear, then, the fraud is that the buyers are not told that NAR is pulling the strings, right, and that the buyers are not told that they have an ability to individually negotiate [a] commission? MR. OLLENNU: Well, Your Honor, if the Court puts it in that way, I think that is part of it.").
[33] *Id.* at 49-50.